UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| DEAN WEBB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:06-cv-174 |
| ) | (VARLAN/SHIRLEY) |
| UNITED PARCEL SERVICE, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Dean Webb ("Webb") brings this action pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, against his former employer United Parcel Service, Inc. ("UPS"). In particular, Webb claims that UPS unlawfully terminated his employment on October 12, 2004, after he sought FMLA leave based on his need to assist his wife as she battled "a life threatening and serious health condition." [*See* Doc. 1, p.3].

This matter is presently before the Court on UPS's motion for summary judgment [Doc. 16]. The issues raised have been well briefed by the parties [*see* Docs. 17, 19, and 20] so that this matter is now ripe for adjudication. Because the Court concludes that Webb was not an eligible employee as defined under the FMLA, UPS's motion will be granted and this case will be dismissed with prejudice.[1]

---

[1] In its motion, UPS contends summary judgment is appropriate because: (1) Webb was not an eligible employee as defined under the FMLA; and (2) Webb did not provide UPS with completed paperwork to qualify for leave under the FMLA. Because the Court agrees with the first prong of UPS's motion, the Court need not address the merits of the second prong.

I. *Relevant Facts*

The facts of this case will, of course, be viewed in a light most favorable to Webb. In 1990, Webb began working for UPS as a seasonal employee in the Knoxville, Tennessee hub [*see* Doc. 16-2, p.2].[2] After he was laid off, Webb returned to the Knoxville hub in 1991 as a part-time employee for UPS working the "preload."[3] [*Id.*]. In 2001, Webb became a full-time "combo employee" working two different part-time shifts for two different supervisors that, when combined, created a full-time position with UPS [*id.* at pp.2-3]. More specifically, Webb worked one-half of his shift in the carwash from approximately 11:00 p.m. to 3:30 a.m. and one-half of his shift as a "charger" from approximately 4:00 a.m. to 8:00 a.m. [*id.*; *see also* Doc. 16-2, p.5 and Doc. 16-3, pp.4-5]. As a charger, Webb was responsible for separating packages as they arrived at the UPS facility to be loaded onto package delivery cars [Doc. 16-2, p.3; Doc. 16-3, pp.2-3].

Webb's supervisor on the preload shift for the last twelve months of his employment (the critical time period for FMLA purposes) was Karen Hurst ("Hurst") [Doc. 16-2, p.6]. Hurst in turn was supervised by Danny Richardson ("Richardson"), the Preload Manager [Doc. 16-4, p.2].

---

[2]All page references to depositions will be to the docket entry page number - not the actual deposition page number.

[3]According to the affidavit of Karen Hurst, the current full-time package supervisor in the UPS facility in Knoxville, "'[p]reload' is a period in which the UPS packages are sorted so that [they] can be loaded on the package cars for their deliveries." [Doc. 16-8, p.1].

In the first prong of its motion, UPS contends that Webb was not eligible for FMLA leave because he had not been employed for at least 1,250 hours of service during the twelve-month period immediately preceding his leave request. *See* 29 U.S.C. § 2611(2)(A)(ii). It is undisputed that Webb informed Richardson on September 17, 2004, that his wife was ill and that he needed to take some leave in order to care for her [Doc. 16-2, pp.12, 14-15, and 32; *see also* Doc. 16-4, pp.3-4]. Thus, the critical twelve-month period to determine whether Webb worked the requisite number of hours would be from September 17, 2003, to September 17, 2004.

With respect to that period of time, Hurst testifies that Webb's absenteeism from work was, by any measure, excessive [*see* Doc. 16-8, p.2]. For example, from November 2003 to September 2004, Webb had more than 40 documented unapproved absences from his preload shift alone [*id.*; *see also* Doc. 16-9, p.2]. Furthermore, according to the testimony of both Hurst and Richardson, Webb's supervisors spoke with him about his absenteeism on at least ten occasions and requested discipline for his absenteeism on numerous occasions [*see* Doc. 16-8, pp.2-3; Doc. 16-10, pp.2-4; and Doc. 16-4, p.8]. Additionally, Webb's supervisors requested an "Intent to Discharge Notice" due to his absences from work on four separate occasions and filed a "Warning Notice" on one other occasion [*see* Doc. 16-11, pp.2-10]. Because Webb was a member of the union,[4] his employment was governed by the collective bargaining agreement and he could not be terminated without progressive discipline [Doc.

---

[4]Webb testifies that he was a member of the union throughout his entire employment with UPS [*see* Doc. 16-2, p.4].

16-2, pp.4 and 47-48]. Moreover, this agreement allows the labor manager to lessen an employee's punishment if he deems it appropriate; therefore, on several occasions when Webb's supervisors requested one form of discipline, a lesser form of discipline was imposed [*id.* at pp.34-39].

It is also undisputed that in June 2004, Webb was caught sleeping on the job and, as a result, UPS terminated his employment [*id.* at pp.13 and 40-45; Doc. 16-4, p.18]. Webb then filed a grievance challenging that termination decision in order to obtain reinstatement [Doc. 16-2, p.13]. Webb's grievance was denied at the local level; however, a panel consisting of an equal number of union and company representatives reduced Webb's termination to a ten-day suspension without pay [*id.* at pp.15-16 and 40-45; Doc. 16-4, p.18]. Consequently, Webb was permitted to return to work on either September 6 or 7, 2004 [Doc. 16-14, p.2].[5]

After returning to work from his suspension on or about September 7, 2004, Webb's attendance issues persisted [*see* Doc. 16-8, p.3]. In fact, UPS's records reflect that Webb's problems began on the very first day back from his suspension (according to this memo, September 7, 2004), when he took "excessive bathroom breaks." [Doc. 16-12, p.16]. As it

---

[5]This exhibit sets forth a copy of a letter from Richardson to Webb dated August 27, 2004, informing Webb that his "Intent to Discharge" notice is being reduced to a ten-day suspension from August 23 through September 3, 2004 [*id.*]. That letter also advises Webb to return to work on September 7; however, the "7" appears to have two lines drawn through it, followed immediately by a "6" [*id.*]. Thus, it is somewhat unclear to the Court as to Webb's precise return date. The Court takes judicial notice of the fact that September 6, 2004, was Labor Day, and thus Webb may not have had to start until the next day. Either way, Webb's return date has no impact on the Court's analysis of the key issue in this FMLA case.

turned out, Webb only worked 6.68 hours that first day [*id.*]. UPS's records also reflect that during the first ten days of employment in September 2004 after his suspension, Webb missed two days, was late three days, and left early on two other days [*see id.* at pp.17-19]. Additionally, Webb failed to show up for an entire shift on September 20, 2004 [*id.* at p.19]. As it turned out, September 17, 2004, was the last day when Webb actually showed up for work at UPS but, on that day, Webb was so sick from vomiting and diarrhea that UPS had an ambulance take him to Fort Sanders Hospital [*see* Doc. 16-2, pp.49-51]. However, upon his arrival at the hospital, Webb refused treatment [*see id.* at pp.50-51].

As previously noted, September 17, 2004, was also the date on which Webb informed Richardson that his wife was ill and that he wanted to take leave. It is undisputed that Richardson escorted Webb to the Human Resources Office and arranged for him to obtain the appropriate FMLA certification forms [*see* Doc. 16-2, p.17; Doc. 16-4, pp.3-5]. Although there is some dispute about what transpired over the next few weeks regarding these FMLA forms,[6] there is no dispute that Webb quit coming to work after dropping off his FMLA forms, regardless of whether they were complete or incomplete [*see* Doc. 16-2, pp.29-30]. Moreover, Webb admits that no one from UPS ever granted him FMLA leave nor gave him permission to take any kind of leave [*id.* at pp.21-22 and 30].

---

[6]Obviously, if the Court were inclined to grant UPS's motion for summary judgment based on its position that Webb never returned completed paperwork to qualify for leave under the FMLA, then a detailed recapitulation of these facts would be in order. As previously observed, however, the Court is granting UPS's motion because Webb has not worked the requisite number of hours under the FMLA to be eligible for FMLA leave. All of the facts regarding the events surrounding the purported completion of these forms are therefore not relevant to the Court's ruling.

On October 1, 2004, UPS sent a letter to Webb informing him that he was not on approved leave and instructing him to return to work [*id.* at pp.31 and 66]. UPS, however, never received a response to this letter and thus sent another letter terminating Webb's employment on October 12, 2004 [*id.* at pp.31 and 67].

In support of its motion for summary judgment, UPS relies heavily on its payroll records, which set forth the hours an employee works and was paid and also sets forth the number of hours paid but not worked, such as sick days or vacation days [Doc. 16-7, pp.2-59; *see also* Doc. 16-6, p.2]. Karen Gebbs, the Finance Supervisor in UPS's Nashville, Tennessee facility, testifies as follows regarding UPS's payroll processes and the documentation of hours worked by UPS employees:

> UPS' payroll system has the ability to recall all of the hours an employee works during a certain time period based on the employee's own punches and include that in a print-out. Likewise, if an employee forgot to clock in and out, the payroll record will reflect the manual time edit. The purpose of the payroll records is to ensure an employee's time is maintained correctly and he or she is paid correctly for that time. For purposes of payroll, only the computer records, and not any handwritten attendance documentation, are used to determine how many hours an employee worked and, therefore, should be paid.
>
> 3. These documents are accurate representations of the hours worked because the time is directly extracted from UPS' computer payroll system based on the time the employee him or herself recorded and/or reported in the system. If an employee is paid for his time, this documentation system shows a record of it. Further, there is no way for someone to go into this system after time has been paid and alter the hours reflected for an employee.

[Doc. 16-6, pp.1-2]. Based on UPS's payroll records, Gebbs testifies that from September 17, 2003, until September 17, 2004, Webb was paid for 1,464.24 hours [*id.* at p.2; *see also*

6

Doc. 16-7, pp.2-59]. Nevertheless, of that total amount of time, 316 hours were for sick time and vacation [*id.*]. Furthermore, Webb neither worked nor received compensation during his two and a half month suspension [*id.*]. The total number of hours Webb actually worked, therefore, during the twelve-month period preceding his FMLA leave request was 1,148.24 [*id.*]. It must be emphasized that Webb admits that he was paid for all of the time when he worked at UPS [Doc. 16-2, pp.6-7].

In an effort to create a genuine issue of material fact regarding UPS's time records, Webb points to Richardson's testimony that UPS's payroll records or the handwritten attendance records might contain an inaccuracy [*see* Doc. 19-2, pp.8-12]. UPS points out, however, that this statement was made by Richardson after a review of only certain payroll records, which he had never seen until his deposition [*id.*, pp.6-12]. Moreover, Richardson was not the individual at UPS who made the determination as to whether Webb was eligible for FMLA leave [*id.* at p.6]. More importantly, Richardson underscores the fact that the payroll records and the handwritten records would contain different information based on Webb's "combo job" work schedule [*see* Doc. 16-4, pp.10-13 and 14-15]. UPS candidly admits that there are differences in Webb's payroll records and the handwritten attendance records prepared by Hurst. UPS emphasizes, however, that these differences are directly attributable to the timing of Webb's "combo job" work schedule. As previously noted, Webb begins work each day with his "first half" job late at night, usually around 11:00 p.m. [Doc. 16-2, pp.2-3]. That first half job then stretched into the early morning hours the following day [*see id.*]. After a break, Webb would begin his "second half" job, when Hurst supervised

7

him [*see id.*; *see also* Doc. 16-3, pp.2 and 4-5]. The payroll records, however, treat all time when plaintiff worked on each shift as payment for the day on which his shift actually began [*id.* at pp.4-5]. Hurst's attendance records for Webb, on the other hand, reflect only the date of the shift on which he was actually working for her, which would always be a day *after* the payroll records [*id.*].

This purported discrepancy is highlighted by Webb in discussing his employment for February 20, 2004, when Webb's payroll records reflect no hours worked for Hurst that day, although Hurst's handwritten form shows Webb did, in fact, work [*see* Doc. 16-10, p.2]. However, Hurst simply documented Webb's presence for the second half of his February 19th shift on the date on which it was actually worked - February 20th - because it was past midnight [*see* Doc. 16-3, pp.4-5]. Viewed in that light, the Court agrees with UPS that its records are indeed consistent for purposes of determining the total amount of hours worked by Webb for UPS.

In response to UPS's time records and UPS's explanation for the discrepancy between the computer records and the handwritten forms based on Webb's "combo job" work assignment, Webb testifies that he "know[s that he] was at work more than that," *i.e.*, more than UPS's records reflect [*see* Doc. 16-2, pp.7-8]. However, plaintiff admits that he has no evidence to support his "gut feeling" about this issue [*see id.* at p.8].

## II. *Summary Judgment Standards*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials "negating" the opponent's claim. Id. at 323 (emphasis in original); *Adock v. Firestone Fire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir. 1987). Rather, "the burden on the moving party may be discharged by `showing' - that is, pointing out to the district court - that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249-50.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 503 U.S. 939 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir. 1991).

III. *Law and Analysis*

To prevail on an FMLA interference claim, Webb must prove by a preponderance of the evidence that: (1) he was an eligible employee as defined under the FMLA; (2) UPS was an employer as defined under the FMLA; (3) Webb was entitled to leave for one of the

reasons set forth under the FMLA; (4) Webb gave UPS notice of his intention to take leave as required by the FMLA; and (5) UPS improperly denied the FMLA benefits to which Webb was entitled. *See Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005); *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The threshold question in this case is whether Webb was an eligible employee under the FMLA. "Where a plaintiff does not qualify as an 'eligible employee,' the court lacks jurisdiction to decide the FMLA case." *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004) (citation omitted); *Massengill v. Anderson County Bd. of Educ.*, 478 F. Supp.2d 1004, 1008 (E.D. Tenn. 2007) (holding that an employee who does not meet the eligibility requirements under the FMLA cannot pursue a cause of action for denial of leave); *Alazawi v. Swift Transp. Co. Inc.*, 391 F.Supp.2d 626, 633 (W.D. Tenn. 2004) (summary judgment granted to employer when the employee had not been employed the requisite amount of time prior to his FMLA request and thus was not eligible for leave).

It is indeed Webb's burden to present evidence that he was eligible for FMLA leave at the time it was requested. *Massengill*, 478 F.Supp.2d at 1006 ("[t]he plaintiff must prove *by a preponderance of the evidence* that: (1) [he] was an eligible employee as defined in the Act" (emphasis added)); *Hinson v. Tecumseh Prods. Co.*, 2000 U.S. App. LEXIS 26778 (6th Cir. 2000) (holding "[s]ince [the plaintiff] failed to provide the court with any evidence of the number of overtime hours she allegedly worked or evidence to rebut [defendant's] employment records to defeat a motion for summary judgment, the trial court's decision must be affirmed.").

As just noted, a claim for denial of leave under the FMLA first requires that plaintiff prove he was eligible to take leave. Under the FMLA, an employee is considered eligible to take leave if the employee has worked for the employer for twelve months prior to the leave and the employee worked 1,250 hours within the twelve months. 29 U.S.C. § 2611(2); 29 C.F.R. § 825.110(a). "The statutory text is perfectly clear and covers the issue. The right of family leave is conferred only on employees who have worked at least 1,250 hours in the previous 12 months." *Massengill*, 478 F. Supp.2d at 1007 (citing *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 582 (7th Cir. 2000)).

In this case, Webb has presented no evidence in the form of payroll records, paycheck stubs, calendars, notes, or affidavits that create a genuine issue of material fact that he worked the requisite 1,250 hours to be eligible for FMLA leave. UPS obviously does not dispute the fact that Webb was paid for over 1,400 hours during the year prior to his purported request for FMLA leave. Nevertheless, the number of hours paid has no legal relevance. Rather, it is number of hours the employee works that matters for purposes of FMLA. *See, e.g.,* 29 C.F.R. § 825.110(c)) ("[t]he determining factor is the number of hours an employee has worked for the employer within the meaning of the FLSA.[7] ... [a]ny accurate accounting of actual hours worked under FLSA's principles may be used."); 29 U.S.C. § 207(e)(2) (under the FLSA, the calculated rate "shall not be deemed to include ...

---

[7]"Whether an employee has worked the minimum 1,250 hours of service [under the FMLA] is determined according to the principles established under the Fair Labor Standards Act (FLSA) for determining compensable hours of work ... ." 29 C.F.R. § 825.110(c).

(2) payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause... .").

Here, even though it is not UPS's burden to demonstrate that Webb is ineligible under FMLA, it has submitted records which irrefutably do so. UPS's payroll records as further supported by the affidavits of Hurst and Gebbs indicate that Webb only worked 1,148.24 hours between September 17, 2003 and September 17, 2004. Moreover, Webb concedes that UPS paid him for all hours he worked. Consequently, Webb is over 100 hours short of being eligible for FMLA leave. Plaintiff's speculative testimony that he has a "gut feeling" that he worked more hours than UPS's payroll records demonstrate is simply not sufficient evidence to create a genuine issue of material fact. *See, e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).

## IV. *Conclusion*

Applying the above summary judgment standard to the facts of this case, UPS's motion for summary judgment must be granted and this action dismissed against it.

Enter judgment accordingly.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE
